FILED

2015 Jul-15  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TAMMY L. LUCIO,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:13-CV-1970-RDP** |
| | } | |
| **CITY OF TARRANT, ALABAMA, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This matter is before the court on the Motions for Summary Judgment filed by Defendants Keith Smith (Doc. # 94), Larry Rice (Doc. # 96) and Chase Ramsey (Doc. # 98). The Motions have been fully briefed.  (Docs. # 95, 97, 99, 103, 104, 108, and 111-13).

## I.   Relevant Background and Facts[1]

On or about September 19, 2011, Plaintiff Tammy L. Lucio was taken into custody for disorderly conduct and was transported to the City of Tarrant Jail.  (Doc. # 56). While there, Plaintiff alleges that Defendant Smith pushed her, causing her to fall and break her arm. Thereafter, among other things, Plaintiff alleges that she was denied medical attention for her arm, despite repeated requests for same.  She claims this caused permanent damage to her arm. (Doc. # 56).

---

[1] The court views the facts in the light most favorable to Plaintiff, the non-movant. The court has reviewed the evidence, and all factual inferences arising from it, in the light most favorable to the nonmoving party. Also, these are the facts for summary judgment purposes only; they may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'" (citation omitted). Thus, the court recognizes that the facts that may be presented if this case were to proceed to trial may be different than the facts presented on summary judgment; however, the court must take Plaintiff's plausible versions of the facts as true at this stage. If the facts are in dispute, they are stated in a manner most favor to the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

The Rule 56 evidence indicates that Officer Smith transported Plaintiff to the Tarrant jail and escorted her inside to the booking room.  (Doc. # 100-1 p. 97).  Officer Smith removed Plaintiff's handcuffs in the booking room.  (Doc. # 100-1 p. 99).  After the booking process was completed, Officer Smith instructed Plaintiff to change into jail clothes, which she did in the visitation hall, under the supervision of Officer Sharon Briggs.  (Doc. # 100-1 p. 102).  After Plaintiff changed clothes, Officer Smith stood in the doorway between the booking room and the visitation hall.  (Doc. # 100-1 p. 104).  Plaintiff was standing within arm's reach of Officer Smith.  (Doc. # 100-1 p. 104).  Plaintiff testified that she turned toward Officer Smith to ask him to use the phone.  (Doc. # 100-1 p. 105-07).  Officer Smith, however, perceived Plaintiff's action to be aggressive toward him.  (Doc. # 100-7 ¶ 4).  With open hands, Officer Smith pushed Plaintiff away from him in order to put some distance between them.  (Doc. # 100-7 ¶ 4).  As a result of the push, Plaintiff fell to the floor, hitting her left wrist on a stool as she fell.  (Doc. # 100-1 p. 120).

After Plaintiff got up, Officer Smith escorted her to a jail cell.  (Doc. # 100-1 p. 126).  Plaintiff told Officer Smith that she had broken her arm and needed to go to the hospital.  (Doc. # 100-1 p. 127).  Once being placed in a cell, Plaintiff "hollered" and kicked the door for a time period she believes to be about thirty minutes.  (Doc. # 100-1 pp. 128-129).  Officer Smith returned to Plaintiff's cell with "at least four" paramedics.  (Doc. # 100-1 p. 130).  Plaintiff described the examination by the paramedics as follows:

Q:     And what did they do?

A:     They examined me, looked at me and wanted to place a blood pressure cuff on this arm.  I told the gentleman that this was the hurt arm, could he put it on this right arm.  And that agitated Officer Smith, and he removed them from my cell, the paramedics.

Q:     Before they took your blood pressure?

A:     They never took my blood pressure because I told him to put it –do it on this arm instead of this arm.

Q:     You mean you told him –

A:     My left arm, they wanted to take it on my left arm.  And I asked the paramedics to remove it and take my blood pressure on my right arm. And that agitated Officer Smith and he removed the paramedics.  The paramedics left after that.

Q:     Did the paramedics ever examine your left wrist?

A:     Visual.  They looked at it.  They never touched it.  They just looked at it.

Q:     Did they ever take your hand and press the tips of your fingers?

A:     No.

(Doc. # 100-1 pp. 131-132).

Q:     Okay.   Had they checked any other vital sign before Officer Smith instructed them to leave?

A:     No.

Q:     All they were able to do, according to you, was look at your left arm and start to take your blood pressure?

A:     Correct.

(Doc. # 100-1 p. 136).

The Patient Care Narrative prepared by the paramedics reflects that the paramedics obtained Plaintiff's name, address, age, date of birth and chief complaint of left wrist pain.  (Doc. # 100-4).  The paramedics also checked and recorded Plaintiff's pulse, respirations and specific oxygen.   (Doc. # 100-4).  The paramedics also noted that "Pt. in custody of Tarrant Police Dept. Pt. c/o (L) wrist pain.  Pt. states her (L) arm hurts.  Normal cap refill.  No obvious deformity.  Pt. stable.  Pt. left in custody of Tarrant P.D."   (Doc. # 100-4).   Nothing in the Patient Care

Narrative indicates that Plaintiff's arm was broken or that she needed further medical attention. (Doc. # 100-4).  Officer Smith signed the form refusing treatment.  (Doc. # 100-4).

After the paramedics left her cell, Plaintiff had no further interaction of any kind with Officer Smith.

Plaintiff's only interaction with Officer Ramsey was on the morning of September 20, 2011, where Officer Ramsey supervised Plaintiff for approximately 5 minutes while she placed a phone call.  (Doc. # 100-1 pp. 142-144).  In her deposition, Plaintiff described her full interaction with Officer Ramsey as follows:

> Q:    Okay.  So Tuesday morning is your first morning in the Tarrant jail in September of 2011?
>
> A:    Correct.
>
> Q:    Who's the first officer that you have any communication with Tuesday morning?
>
> A:    Chase Ramsey.
>
> Q:    And what was the nature of that communication?
>
> A:    He - - I stopped him and I asked him - - told him about my arm, that my arm was hurt and I needed to go to the hospital.  And, also, could I use the phone to let my family know that I was hurt in this jail and had not been able to - - been taken to the hospital.
>
> Q:    Okay.  What did he say?
>
> A:    He let me out to use the phone.
>
> Q:    How far is it from the cell you were in to where you could use the phone?
>
> A:    The booking area where I was initially, where I came in.
>
> Q:    Just a few --
>
> A:    So a few steps.
>
> Q:    A few steps.  Did he stand there while you used the phone?

A:      He stood beside me.

Q:      How long were you on the phone?

A:      Five minutes maybe at the most. No more than five minutes.

Q:      And then did you go directly back to your cell?

A:      Yes.

Q:      Did Officer Ramsey say anything about your request to - - did you say you asked him to go to the hospital?

A:      I asked him to go to the hospital.

Q:      And did he say anything in response to that request?

A:      Just that he would pass it on, he would pass the information on.  Whatever that meant.

Q:      Did he examine your arm at all?

A:      He visibly saw the swelling.  I showed it.  Like, look, like I need to go to the hospital. See.

Q:      Did he touch your arm --

A:      No.

Q:      -- at all?

A:      No.

Q:      Did he ask you what happened?

A:      No.

Q:      Did you tell him how your arm was injured?

A:      No.

Q:      You showed him your swollen arm.  He said he would pass it on?

A:      Uh-huh (affirmative).

Q:      And then took you back to your cell?

A:       Correct.

Q:      And you had no further interaction with Officer Ramsey during this September 2011 incarceration?

A:      Correct.

(Doc. # 100-1 pp. 141-144).

Plaintiff encountered Detective Rice twice during her incarceration in the Tarrant jail. (Doc. # 101-1 p. 188).  The first interaction occurred on the morning of September 21, 2011. [(Doc. # 100-6).  That morning, Detective Rice learned that Plaintiff was at the jail. (Doc. # 100-2).

Detective Rice reviewed the EMT's Patient Care Narrative on Plaintiff before talking to her. (Doc. # 100-2).  Nothing in the Patient Care Narrative caused Detective Rice to believe that Plaintiff's arm was seriously injured or that she had any kind of serious medical condition.  (Doc. # 100-2).  Detective Rice retrieved Plaintiff from her cell and took her to his office. (Doc. # 100-1 p. 144).  In his office, Detective Rice interviewed Plaintiff regarding a felony theft of a wallet from a man at the American Legion (Doc. # 100-1 p. 145), and a felony theft of a gun from a woman's home (Doc. # 100-1 p. 202).  Plaintiff confessed to both crimes. (Doc. # 100-1 pp. 145, 192).  Plaintiff did not ask Detective Rice to take her to the hospital, nor did she request any other form of medical assistance from him before or during this September 21, 2011 interview. (Doc. # 100-1 p. 151).

Plaintiff then accompanied Detective Rice and Lt. Cox in an effort to recover the stolen items. (Doc. # 100-1 p. 152).  Plaintiff was with Detective Rice and Lt. Cox for about an hour as they successfully retrieved both stolen items. (Doc. # 100-1 pp. 177-182).  Plaintiff did not ask Detective Rice or Lieutenant Cox for any medical assistance while they recovered the stolen

property.  (Doc. # 100-1 pp. 153, 183-184).  Plaintiff did not mention her alleged left wrist injury to any of the people that she and the Detective Rice encountered during the course of recovering the stolen property.  (Doc. # 100-1 pp. 176, 180, 182-183).

Detective Rice then returned Plaintiff to her cell in the Tarrant jail. (Doc. # 100-1 p. 184). Plaintiff did not ask Detective Rice for any medical assistance upon their return to the jail before she was returned to her cell for the day.  (Doc. # 100-1 pp. 184-185).

The second interaction between Detective Rice and Plaintiff occurred the next day – on the morning of September 22, 2011.  Detective Rice took Plaintiff from her cell into his office and took recorded statements from Plaintiff confessing to the two felony theft crimes. (Doc. # 100-1 p. 190).  On the way to Detective Rice's office, Plaintiff told Detective Rice that she needed to go to the hospital because she thought her arm was broken.  (Doc. # 100-1 pp. 190-191).  Plaintiff never told Detective Rice how she had injured her arm, nor did she attempt to show her arm to Detective Rice.  (Doc. # 100-1 p. 151; Ex. 2).  Detective Rice did not notice any swelling, bruising, or obvious deformities of Plaintiff's arm during his interactions with her on either September 21 or September 22, 2011. (Doc. # 2).  Detective Rice responded to Plaintiff's statement by saying Jefferson County had good x-ray machines, and she would get an x-ray when she got there.  (Doc. # 100-1 p. 191).  Detective Rice returned Plaintiff to her cell after obtaining her taped confessions. (Doc. # 100-1 p. 192).  Detective Rice had no further interaction with Plaintiff during her September 2011 incarceration.  (Doc. # 100-1 p. 192).

Later that day, however, Officer Ricky Ganey took Plaintiff to St. Vincent's East Hospital for a second assessment of her arm.  (Doc. # 100-1 p. 266; Doc. # 104 at ¶ 24).  Officer Ganey then transported Plaintiff from St. Vincent's East to the Jefferson County jail on evening of September 22, 2011.  (Doc. # 100-1 pp. 269-270).

## II.      Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, the Rule requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *See id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc.* teaches, Rule 56(c) "does not allow the plaintiff to simply rest on his

allegations made in the complaint; instead, as the party bearing the burden of proof of trial, he must come forward with at least some evidence to support each element essential to his case at trial." *Anderson*, 477 U.S. at 252. "Mere allegations" made by plaintiffs are insufficient. *Id.*

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp.2d 1257, 1262 (D.Kan. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so onesided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp.2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc*., 62 F. Supp.2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Discussion

Plaintiff advances the following claims against the moving defendants:

1.       Against Defendant Smith, Plaintiff asserts two Section 1983 claims, one for the use of excessive force and the other for deliberate indifference to Plaintiff's serious medical need, and state law negligent hiring, training and/or supervision and assault claims.  (Doc. # 56).

2.     Against Defendant Rice, Plaintiff asserts a Section 1983 claim for deliberate indifference to Plaintiff's serious medical need and a state law negligent hiring, training and/or supervision claim.  (Doc. # 56).

3.     Against Defendant Ramsey, Plaintiff asserts a Section 1983 claim for deliberate indifference to Plaintiff's serious medical need and a state law negligent hiring, training and/or supervision claim. (Doc. # 56).

The court addresses each of Plaintiff's claims below.

**A.     Plaintiff's Negligent Hiring, Training and/or Supervision Claims Fail as a Matter of Law**

In ruling on Defendant Reno's Motion to Dismiss, this court already held that Plaintiff's Negligent Hiring, Training and/or Supervision Claims are due to be dismissed in their entirety. (Docs. # 75 and 76).  Alabama does not recognize a cause of action for a supervisor's negligent training or supervision of a subordinate. *See e.g., Doe v. City of Demopolis*, 799 F.Supp.2d 1300, 1312 (S.D. Ala. 2011) ("Alabama law does not recognize a cause of action against a supervisor or municipality for negligent training or supervision."); *Ott v. City of Mobile,* 169 F.Supp.2d 1301, 1314-15 (S.D. Ala. 2001) (dismissing a negligent retention, training, and supervision claim against a municipality because "Alabama recognizes no cause of action against a supervisor for negligent failure to supervise or train a subordinate … .").

In a similar action filed in the Middle District of Alabama, that court granted summary judgment in favor a city police chief on a state law claim for negligent training, supervision, and retention. *See Borton v. City of Dothan*, 734 F.Supp.2d 1237, 1262 (M.D. Ala. 2010) (emphasis added). The *Borton* court reached its conclusion after citing the general rule that a police chief could not be liable for negligent training or supervision because "no such cause of action exists under Alabama law. . . ." *Borton*, 734 F.Supp.2d at 1258 (citing *Hamilton v. City of Jackson*, 508

F. Supp. 2d 1045, 1054-58 (S.D. Ala. 2007)); *see also Crutcher v. Vickers*, 2012 WL 3860557, *13 (N.D. Ala. 2012).  If no such cause of action lies against a chief of police in Alabama, it follows that Plaintiff cannot establish such a claim against these Defendants.  Therefore, Plaintiff's claim for negligent hiring, training, and supervision fails to state claim upon which relief can be granted, and Defendants Smith, Rice and Ramsey are each entitled to dismissal of those claims asserted against them.

**B.     Defendants Are Entitled To Summary Judgment On Plaintiff's Section 1983 Claims Alleging A Deliberate Indifference To A Serious Medical Need**

As part of one of the section 1983 claims she has advanced, Plaintiff contends that Defendants were deliberately indifferent to her serious medical needs.  The Eighth Amendment prohibits cruel and unusual punishment, which includes deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Claims of deliberate indifference to serious medical needs arise under the Eighth Amendment when the claimant is a convicted prisoner.  However, when a section 1983 Plaintiff is a pre-trial detainee, the claim must be asserted under the Fourteenth Amendment.  *Gilmore v. Hodges*, 738 F.3d 266, 271 (11th Cir. 2013).  Nevertheless, the minimum standard for providing medical care to a pretrial detainee is identical to the minimum standard required by the Eighth Amendment for a convicted prisoner, and courts analyze the claim under the decisional law of both amendments.  *Id*.

"Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference." *Adams v. Poag*, 61 F.3d 1537, 1543-44 (11th Cir. 1995) (citing *Carswell v. Bay Cnty*., 854 F.2d 454, 457 (11th Cir. 1988); *Ancata v. Prison Health Servs., Inc*., 769 F.2d 700, 704 (11th Cir. 1985)).  Not every claim of inadequate medical treatment states a cognizable claim under the federal constitution. *Id*. "Medical treatment [is deliberately indifferent] only when it is so grossly incompetent,

inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citation omitted) (Eighth Amendment case).

To establish that a jail official is deliberately indifferent to her serious medical need, a prisoner must satisfy both an objective and a subjective component. *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999). Regarding the objective component, a prisoner must show both an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm, and also that the response by the prison official to that need was poor enough to constitute an unnecessary and wanton infliction of pain. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).  An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted).  In "delay in treatment" cases, even when treatment is ultimately provided, deliberate indifference may be "inferred from an unexplained delay in treating a known or obvious serious medical condition." *Harris v. Coweta Cnty.*, 21 F.3d 388, 394 (11th Cir. 1994).

In connection with the subjective component, a prisoner must establish three factors: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Additionally, as with any tort claim, the prisoner must show that an injury was caused by the defendant's wrongful conduct. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

12

It is not enough to show that the care provided was less than optimal, or that a different course of treatment might have been preferable. The required subjective elements of a deliberate indifference claim ensure that "mere accidental inadequacy, negligence in diagnosis or treatment, [and] even medical malpractice" are not actionable under section 1983. *Taylor*, 221 F.3d at 1258. A prisoner also cannot establish a violation simply because she "may have desired different modes of treatment" than that which was provided to her. *Hamm v. DeKalb County*, 774 F.2d 1567, 1576 (11th Cir. 1985). Such a course of treatment claim, by definition, involves the "exercise of professional judgment" and as such is not actionable. *Estelle*, 429 U.S. at 105.

### 1.    Plaintiff Failed To Show An Objectively Serious Medical Need

In this case, shortly after arriving at the police station, Smith pushed Plaintiff, causing her to fall and break her arm.  After being placed in a cell, Plaintiff "hollered" and kicked the door for what she believes to be about thirty minutes.  (Doc. # 100-1 pp. 128-129).  Thereafter, Smith returned to Plaintiff's cell with "at least four" paramedics.  (Doc. # 100-1 p. 130).  Plaintiff disputes the adequacy of the treatment by the paramedics, and claims Smith interfered with that treatment, but it is undisputed that upon Plaintiff's complaint of an injury, Defendants called the paramedics who examined Plaintiff.  This does not demonstrate a deliberate indifference to Plaintiff's claimed medical need.  As to Plaintiff's claim that Smith interfered with the examination of her, that claim is an inadequacy or negligence in diagnosis or treatment claim which is not actionable under section 1983. *Taylor*, 221 F.3d at 1258.  Defendants called the paramedics, and the paramedics reported that they examined Plaintiff.  They did not notice evidence of a broken arm.  Their report states: "Pt. c/o (L) wrist pain.  Pt. states her (L) arm hurts.  Normal cap refill.  No obvious deformity.  Pt. stable." (Doc. # 100-4).

As discussed above, an objectively serious medical need is "one that has been diagnosed by a physician" or "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow*, 320 F.3d at 1243.   At the time Plaintiff claims defendants were deliberately indifferent, there was no diagnosis by a physician that Plaintiff's arm was broken.   Nonetheless, Defendants called the paramedics on the basis of Plaintiff's subjective complaints.   Four paramedics (who have medical training which a lay person does not), did not consider it "obvious" that Plaintiff needed medical attention.   This is the case even if, as Plaintiff contends, their examination was interrupted.   If it was not obvious to the paramedics that Plaintiff's arm was broken (according to Plaintiff, they tried to put a blood pressure cuff on that arm), there is no basis for the argument that it was "so obvious" that Defendants (who are lay people) should have easily recognized the need for medical attention. And to reiterate, Defendants had already called the paramedics for medical attention.   On these facts, Plaintiff has failed to show that she had a legally cognizable, objectively serious medical need.[2]

### 2.    Plaintiff Failed To Show Subjective Knowledge of A Serious Medical Need

As discussed above, after Plaintiff's fall, paramedics were called.   Before Detective Rice interviewed Plaintiff the next day about two felony thefts, he reviewed the paramedics' report.   It revealed no medical diagnosis and reported no obvious problem.   During the interview, Plaintiff

---

[2] Plaintiff claims that the four paramedics visited her cell, but Smith became irritated with her and ordered them out of the cell before they finished examining her arm. Nevertheless, the paramedics completed a Patient Care Narrative.  (Doc. 100-4).  That narrative indicates that the paramedics checked on Plaintiff in her cell, noted her chief complaint was a hurt arm, but saw no obvious deformity. (*Id.*). There is an obvious disagreement between Plaintiff on the one hand, and Smith and the paramedics on the other, as to what occurred in the jail cell that day. If this were a negligence case, this may well create a material issue of disputed fact. But here, Plaintiff must show deliberate indifference to her medical needs. Even assuming her version of the events is correct, and that Smith did not allow the paramedics to *complete* their examination of Plaintiff, it is still undisputed that the paramedics did actually observe Plaintiff, placed a blood pressure cuff on her injured arm, and reported later that there were no obvious deformities with respect to that arm.

14

confessed to the two thefts and then accompanied Rice and Lt. Cox in an effort to recover the stolen items. (Doc. # 100-1 p. 152).  Plaintiff was with Detective Rice and Lt. Cox for about an hour as they successfully retrieved both stolen items. (Doc. # 100-1 pp. 177-182).  Detective Rice then returned Plaintiff to her cell.  (Doc. # 100-1 p. 184).  Plaintiff did not ask Detective Rice for any medical assistance during her interview, while recovering the items, or upon their return to the jail before she was returned to her cell for the day.  (Doc. # 100-1 pp.  184-185). Thus, Plaintiff has presented no evidence that Detective Rice had a subjective appreciation that she had a serious medical need.

The following day, Detective Rice took Plaintiff from her cell into his office and took recorded statements from Plaintiff confessing to the two felony theft crimes. (Doc. # 100-1 p. 190).  On the way to Detective Rice's office, Plaintiff told Detective Rice that she needed to go to the hospital because she thought her arm was broken.  (Doc. # 100-1 pp. 190-191).  Detective Rice did not notice any swelling, bruising, or obvious deformities in Plaintiff's arm during his interactions with her on either September 21 or September 22, 2011. (Doc. # 2).  Detective Rice returned Plaintiff to her cell after obtaining her taped confessions (Doc. # 100-1 p. 192) and, later that day, Officer Ganey took Plaintiff to St. Vincent's East Hospital for a second assessment of her arm.  (Doc. # 100-1 p. 266; Doc. # 104 at ¶ 24).

Although Plaintiff asserts that *she* perceived her injury to be obvious, she has failed to present evidence that any of the Defendants had "subjective knowledge of a risk of serious harm." *McElligott*, 182 F.3d at 1255.  Defendants obtained an initial assessment of Plaintiff's condition by medical personnel shortly after she complained of an injury.  The paramedics' report of that assessment did not indicate any serious or obvious injury.  Thereafter, Plaintiff complained on and off about her arm, but she has presented no evidence that there was any

injury which was obvious to Defendants.  To the contrary, the paramedics' initial assessment of Plaintiff indicated "no obvious deformity."  Thereafter, she assisted in the recovery of items she had stolen without complaint.  Nonetheless, after later complaints from Plaintiff, Defendants arranged for Plaintiff to have further medical attention.  The Rule 56 evidence Plaintiff relies upon shows, at most, that Defendants were negligent; but that is insufficient to establish the objective component of her deliberate indifference claim. *McElligott*, 182 F.3d at 1255.

Because Plaintiff failed to establish either the objective or the subjective components of her deliberate indifference claim, and because nothing about Plaintiff's treatment shocks the conscious, Defendants are entitled to summary judgment on this claim. *See Harris*, 941 F.2d at 1505; *Campbell*, 169 F.3d at 1363.

### C.   Defendants Are Entitled To Summary Judgment On Plaintiff's Section 1983 Claims Alleging Excessive Force

Claims of excessive force against prison officials also fall under the proscription against cruel and unusual punishment. Like the deliberate indifference claim addressed above, the standard applied to an excessive force claim also has a subjective and an objective component. As to the objective component, "not every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. *Hudson*, 503 U.S. at 9 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The prohibition against "cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 10 (citation omitted). Accordingly, the Eleventh Circuit requires that a plaintiff suffer more than a *de minimis* injury to establish an excessive force violation,

although courts must remain mindful of the fact that a significant injury is not required. *See Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002).

Under the subjective component, a plaintiff must show that a prison official's actions amounted to an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "Force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting *Whitley*, 475 U.S. at 320-21). In determining whether an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including these five: "the need for the application of force; the relationship between that need and the amount of force used; the extent of the threat to the safety of staff and inmates, as reasonably perceived by officials; the extent of injury; and any efforts made to temper the severity of the response." *Hudson*, 503 U.S. at 7-8,; *see also Whitley*, 475 U.S. at 321; *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999). Upon consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321 (quoting *Johnson*, 481 F.2d at 1033). Although the absence of serious injury is relevant to an excessive force claim, the core judicial inquiry is not whether a quantum of injury was sustained but rather whether force was applied in a good-faith effort to maintain or restore discipline or whether it was applied maliciously and sadistically to cause harm. *See Wilkins*, 559 U.S. at 37; *see also Hudson*, 503 U.S. at 4.

The court's inquiry comes down to "whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior

alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." *Whitley*, 475 U.S. at 322.  "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (internal quotation marks omitted). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier*, 533 U.S. at 205.

Here, Plaintiff was standing within arm's length of Officer Smith.  (Doc. # 100-1 p. 104). Plaintiff turned toward him, ostensibly to ask him to use the phone.  (Doc. # 100-1 p. 105-07). Smith, however, perceived Plaintiff's action to be aggressive.  (Doc. # 100-7 ¶ 4).  Therefore, Smith pushed her away.  (Doc. # 100-7 ¶ 4).  As a result of the single, defensive push, Plaintiff fell and claims to have injured her arm as a result of the fall.  (Doc. # 100-1 p. 120).  Plaintiff characterizes this as Smith breaking her arm.  The court will not engage in semantics here (*e.g.*, did Smith break Plaintiff's arm or did her fall cause the break?). The key here is that there is no evidence, at all, that Smith intended to harm Plaintiff in any way.   Thus, the Rule 56 evidence simply does not "support a reliable inference of wantonness in the infliction of pain … ." *Whitley*, 475 U.S. at 322.

In addition, the record fails to reflect that Smith used force "maliciously and sadistically" for the very purpose of causing harm.   "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Saucier*, 533

U.S. at 209. For these reasons, Defendant Smith is entitled to summary judgment on Plaintiff's excessive force claim.

### D.    Qualified Immunity Bars Plaintiff's Section 1983 Claims

Defendants also argue they are entitled to qualified immunity. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007) (internal quotation marks omitted). "An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within his discretionary authority." *Skop v. City of Atlanta, Georgia*, 485 F.3d 1130, 1136 (11th Cir. 2007). "If the official was acting within the scope of his discretionary authority ... the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." *Id*. at 1136-37. Here, Plaintiff has not challenged the assertion that Defendants were at all times acting within the scope of their discretionary authority.

"To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

As discussed above, relative to both Plaintiff's deliberate indifference claim and her excessive force claim, Plaintiff has failed to present evidence of a constitutional violation. Therefore, Defendants are entitled to judgment as a matter of law on the basis of qualified immunity on those claims.[3]

### E.      Defendants are Entitled to State Agent Immunity on Plaintiff's Assault Claim

Plaintiff only asserts an assault claim against Defendant Smith (for pushing her).  (Doc. # 56 p. 10).  However, even with respect to Plaintiff's assault claim against him, Smith is entitled to judgment as a matter of law because he is entitled to state agent immunity.  Ala. Code § 6–5–338.

Section 6–5–338 of the Alabama Code provides that:

> [e]very peace officer ... shall at all times be deemed to be [an] officer [ ] of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Police officers are "peace officer[s] for purposes of § 6–5–338." *Borders v. City of Huntsville*, 875 So.2d 1168, 1178 (Ala. 2003). The test set out in *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000), defines Alabama's doctrine of state-agent immunity. The same test in *Cranman* for deciding state-agent immunity questions "governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under § 6–5–338(a)." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 741 (11th Cir. 2010). Under *Cranman*,

> [a] State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> ...

---

[3] There is also a substantial argument that Defendants are entitled to qualified immunity because, at the time of the events giving rise to Plaintiffs claims, it would not have been clear to the reasonable public official that their conduct violated Plaintiffs well-established constitutional rights.

(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6–5–338(a).

*Hollis v. City of Brighton*, 950 So.2d 300 (Ala. 2006) (modifying category (4) of *Ex parte Cranman*).

By enacting section 6–5–338, the Alabama Legislature intended to afford municipal law-enforcement officials the immunity enjoyed by their state counterparts. *Ex parte Dixon*, 55 So.3d 1171, 1176 (Ala. 2010); *Sheth v. Webster*, 145 F.3d 1231, 1237 (11th Cir. 1998). By its very terms, the statute extends state-agent immunity to peace officers performing discretionary functions within the line and scope of their law-enforcement duties. *Ex parte Dixon*, 55 So.3d at 1176; *Moore v. Crocker*, 852 So.2d 89, 90 (Ala. 2002). Discretionary functions have been deemed to be "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take, and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Moore v. Adams*, 754 So.2d 630, 632 (Ala. 1999) (citing *Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996), and *L.S.B. v. Howard*, 659 So.2d 43 (Ala. 1995)).

Plaintiff does not even address Defendant Smith's argument that he is entitled to state agent immunity on her assault claim. (Doc. # 108). Therefore, she has not seriously disputed that Smith was engaged in a discretionary function when he pushed her. Plaintiff had been booked at the jail and Smith was preparing her to go to a cell. When Plaintiff, who was within arm's reach of Smith turned toward him, he perceived a threat and utilized a single, defensive push to separate himself from Plaintiff. In doing so, Smith was exercising judgment in the line and scope of his duties as a law enforcement officer. Although Alabama's state-agent immunity

does not apply for "acts taken willfully, maliciously, fraudulently, in bad faith, beyond authority, or under a mistaken interpretation of law," *Grider v. City of Auburn, Ala*., 618 F.3d 1240, 1256 (11th Cir. 2010), nothing about the facts of this case warrant depriving Smith of state agent immunity on this basis.  He is entitled to summary judgment on Plaintiff's assault claim based on state-agent immunity under Section 6–5–338(a).

## IV.    Conclusion

For the foregoing reasons, Defendants are entitled to summary judgment on all of Plaintiff's claims against them.

A separate order will be entered.

**DONE** and **ORDERED** this July 15, 2015.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

22